[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These related actions are to foreclose statutory liens for CT Page 10177 allegedly delinquent common expense assessments due the plaintiff condominium association. See C.G.S. 47-74 of the Condominium Act, C.G.S. 47-68a through 47-90c, and 47-258 of the Common Interest Ownership Act, C.G.S. 47-200 through 47-281.
Defendant purchased two units at the plaintiff's condominium in the summer of 1988. She purchased Unit B-1 in June 1988 [CV 89-0367404S] and Unit A-6 [CV 89-0367403S] in August 1988.
Plaintiff claims that the defendant has been delinquent in paying the monthly common expense charges due the plaintiff. She has been oftentimes. But the dispute here is largely due to the plaintiff's assessment of a $10 late charge and its allocation of subsequent payments towards satisfaction of the late charge(s).
Defendant does acknowledge she is responsible for the monthly common expense charge(s) of $62.59 for each of her units. She does dispute her being charged for many of her supposed delinquencies. She claims she paid her monthly common expense charges, but due to the late charges, and particularly plaintiff's allocation of her payments, some of her payments wrongly have been deemed delinquent by the plaintiff.
Plaintiff originally claimed defendant became liable for the common expense charge for Unit B-1 in July 1988 and for Unit A-6 in August 1988.
The monthly common expense assessment for each unit was $62.59.
Plaintiff relies on its rules and regulations here. Rule #1 of the Rules and Regulations provides:
 "Common charges are due on the first of the month for that month. Common charges not received/postmarked by the 10th of the month will be subject to a $10 late charge. Common charges not paid within the 10 day grace period are subject to an interest charge at the rate of 1% per month (simple interest).
 "Partial payments of Common charges and/or late charges and/or interest charges will be applied first to interest charges, then to late charges, and finally to common charges starting with the most previous month and proceeding to the most current month." Exhibit H. CT Page 10178
Plaintiff contends:
 "Rule Number 1 of the Rules and Regulations clearly defines when common charges are due, the amount of the late charge for common charges not paid on time and the interest charge for failure to make timely payment of common charges. This rule adds the requirement of a $10.00 late charge and restates the interest requirement contained in Article 7 Section 7 of the By-Laws. . . . According to Rule Number 1 of the Rules and Regulations, a late fee will be assessed for a month in which payment of common charges is not received in full. As a result, if a unit owner was late in payment of common expense charges one month and then made a timely payment of the principal balance of the common expense charges due for the next month, that payment would first be applied to the accrued interest and late charge for the prior month before being applied to the common charges due for the current. So even if a common charge was tendered in a timely fashion on that next month, that payment will first be applied to any delinquent charges and if enough of the payment does not remain to pay the current month's common charges in full, then the unit owner will be assessed a $10 late charge and interest will accrue on any unpaid portion of the delinquent common charge." BRIEF, dated April 6, 1992, pp. 3-4.
Plaintiff says Rule #1 of its rules and regulations provides that the monthly common assessment fee must be paid by the tenth of each month. If not so paid, a ten dollar late fee is assessed. Subsequent payments are then applied to outstanding late fees and then to delinquent common charges. Thus, a timely payment in a particular month would be delinquent if there were an outstanding or unpaid late charge; the plaintiff applied the payment to satisfy the unpaid late charge(s) rendering the present payment short and thus delinquent.
This domino effect lies at the heart of this dispute.
The court questions the legitimacy of Rule #1. But even if it were legitimate, the court notes that it may be unduly harsh in some situations. Rule #1 should and must be applied in a fair and equitable manner. CT Page 10179
It is not clear when the Rule #1 regarding the late charge of $10 was adopted by the Board of Directors. But Rule #1 was not adopted until after defendant purchased her two units.
Defendant purchased Unit B-1 in June or July 1988 and Unit A-6 in August 1988.
When defendant purchased Unit B-1 in June or July 1988, a Resale Certificate was prepared by the plaintiff. An Addendum thereto stated the condominium fees were "due by the 10th of each month in advance. Payments received after the 10th of each month will be considered late and a 10% late charge will be imposed." Exhibit 3, p. 2.
A meeting of the Unit Owners was held on August 24, 1988. According to the minutes thereof, the Board of Directors reported its then recent doings. It did not report that it had enacted the late charge rule or regulation. See Exhibit I.
By its undated August-September Newsletter #1, the Board reported the new $10 late charge. "The policy of the Association is that condo fees are due by the tenth of each month. Anytime condo fees are not received/postmarked by the 10th, a ten dollar late charge is assessed." [Underscoring added.] Exhibit K.
The next meeting of the Unit Owners was held on January 17, 1989. The minutes report:
 "New rules and regulations of the condominium were announced by the Board of Directors, including penalties for violating such rules. A copy of such rules is to be mailed to every owner." Exhibit B, p. 2.
The court concludes that copies of the Rules and Regulations had not been distributed to the unit owners as of January 17, 1989. Although defendant was present at that meeting and her unpaid common charges were discussed, there is nothing to indicate she was told about the late charges and the allocation of late payments to the payment thereof. Exhibit B, p. 1,
There was little or no evidence presented as to when defendant was informed of the $10 dollar late charge, i.e. Rule #1. There was no evidence that she ever received the August-September Newsletter #1, Exhibit K, or a copy of the Rules and CT Page 10180 Regulations containing the $10 late charge provision, Exhibit H. In its Brief, plaintiff was at pains to show that defendant was well aware of $62.59 monthly common charge and that she knew it was due on the first of each month. BRIEF, April 6, 1992, p. 1. The Brief, significantly, is silent with respect to her having knowledge before January or February, 1989 of Rule #1 regarding the late fee and the allocation of subsequent payments to late fees. The court cannot determine when defendant became aware of Rule #1 and or its contents. It was not before January 17, 1989.
Plaintiff claims defendant met with Dorsey after the January 17, 1989 Unit Owners Meeting at which time Dorsey explained in depth the amount plaintiff claimed defendant owed. BRIEF, April 6, 1992, p. 9.
The court finds that the plaintiff has not proven that the defendant knew, or should have known, of the late fee rule, Rule #1, before January 1989. Defendant therefore is not liable for same. The plaintiff cannot recover late charges for the months before February 1989. Nor can she be held liable for the consequences of her not paying these late charges. In short, later payments rendered delinquent because of the plaintiff's assessment of a late charge for any month before February 1989, or from the allocation of later months' payments to late charges or interest for the months before February 1989 are improper.
Plaintiff has continued to charge defendant the $10 late fee for the months prior to February 1989. See Exhibits 5, 6, E, F, G, N, and O. Later payments made by defendant for the monthly common expense charges were then applied by the plaintiff to the outstanding late charges, This, domino like, caused further delinquencies and late charges. This continued until defendant, in frustration, stopped making payments to the plaintiff but claiming to put the withheld payments in escrow with her attorney.
The $10 late charge rule/regulation was not enacted by the Board of Directors until after the August 24, 1988 meeting of the Unit Owners. Defendant did not acquire title to Unit A-6 until August 18, 1988. Nevertheless, plaintiff assessed the late charge against the defendant for the August 1988 for Unit A-6. Plaintiff now acknowledges defendant is not liable August 1988 $10 late charge. Similarly, plaintiff assessed the late charge for Unit B-1 for the months of July and August 1988. CT Page 10181
On April 1, 1990, Plaintiff's Secretary-Treasurer wrote to defendant's attorney regarding defendant's account. Dorsey stated: "But please be aware that our position is that payments received our (Sic) first applied to legal charges, then to interest, then to late charges and finally to common charges." Exhibit G.
Plaintiff's Rule #1 provides; "Common charges not received/postmarked by the 10th of the month will be subject to a $10 late charge." There was no evidence of when defendant's payments actually were "received" or "postmarked."
Almost immediately upon defendant's purchasing these units, the plaintiff's Secretary-Treasurer, Paul Dorsey, developed an hostility towards the defendant. The court finds that this caused, or at least significantly contributed to, the situation which resulted in these suits.
Just when defendant made her payments is of central importance to a resolution of this case. Plaintiff had the burden of proof on this issue. Its proof was lacking. Its various accountings are in conflict and in error. Plaintiff disputed the amounts plaintiff claimed were due. As held above, plaintiff is not liable for any late charges for any of the months before February 1989. But even so, plaintiff's accountings are erroneous. For example, plaintiff wrote to defendant on September 13, 1988 saying she owed for the months of August and September on the two units, i.e. $250.36. That letter stated that if that amount were paid immediately and a policy statement regarding the late charges was signed and returned, the late charge would be waived. Plaintiff's Exhibit J. There is no evidence whether the policy statement was signed and returned. However, plaintiff's accounting acknowledges that the plaintiff had received $250.36 from the defendant as of October 1, 1988. Plaintiff's Exhibit G, p. 3. Nevertheless, plaintiff continued to charge defendant for late fees on the two units for the months of August and September 1988. This resulted in the domino effect making subsequent payments short and therefore delinquent because of the allocation method of Rule #1. Plaintiff ultimately has acknowledged that defendant was not liable for the August 1988 common charge for Unit B-1 and/or the $10 late charge. Its not clear to the court whether subsequent payments rendered delinquent by the plaintiff's original charges for August 1988 for Unit B-1 have been corrected. CT Page 10182
Plaintiff's proof on the amount owed by the defendant was inconsistent, confusing and unconvincing.
Defendant claims that at times they (plaintiff's Dorsey and Pistritto) would not accept her attempts at payment. Dorsey thereafter denied he ever refused her payments. According to plaintiff's minutes of the August 24, 1988 Unit Owners meeting, "Condo fees should be now mailed to Chet Pistrito . . . ." Plaintiff's Exhibit I. Although Pistritto was present during a part of the trial, he was not called to testify to refute defendant's testimony that her payments were refused.
Similarly, defendant's attempts to get an accounting and resolution of the dispute over what she owed were not successful. According to plaintiff's By-Laws, and by statute, C.G.S. 47-258(h), a unit owner was entitled to a statement of account upon request. Perhaps defendant did not make the request with the requisite formality. However when a meeting was held on January 17, 1989, the "numbers" supplied by plaintiff were not correct. In plaintiff's Amended Complaint, June 27, 1990, Count Two, 9 [107] and Amended Complaint, April 3, 1991, Count Two, 9 [114.10], plaintiff states: "The Defendants have failed to pay since April, 1988 and still fail to refuse to pay . . . ." Since defendant did not acquire Unit B-1 until July, it is no wonder defendant didn't know what she owed. The court finds that defendant's alleged delinquencies resulted from plaintiff's failure to advise her of the late charge and late payment allocation rule in a timely manner.
Furthermore, when she was told of the late charge rule, which was not earlier than January 1989, the previously assessed late charges continued to be charged thereby making subsequent payments short and delinquent. The court holds the defendant should not be held delinquent until, out of frustration, she stopped making payments and had payments made into an account held by her attorney. The court finds this withholding of payments justified, at least partially, under the circumstances. There is an additional reason for the court's conclusion and action being taken herein. Plaintiff claims Rule #1 was "adopted pursuant to Article 4 Section 2(O) of the By-Laws at the end of August, 1988." BRIEF, April 6, 1992, p. 3
The By-Laws of the plaintiff provide:
CT Page 10183 "The Board of Directors shall have the following powers and duties necessary for the administration of the affairs of the Association and may do all such acts and things as are not by law or the By-Laws directed to be exercised and done by the Unit Owners. Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:
* * *
 "(o) Adopting and amending reasonable Rules and Regulations governing the conduct of all people on the Property and the operation and use of the Condominium. The Board shall have the power to levy fines against the Unit Owners for violation thereof, for which they are responsible, provided that no fine may be levied for more than Twenty-Five ($25) Dollars for any one violation; but for each day a violation continues after notice, it shall be considered a separate violation. Collection of fines may be enforced against the Unit Owner or Owners responsible as if the fines were a Common Charge owed by the particular Unit Owner or Owners." By-Laws, Article IV, Section 2. Exhibit A.
Rule #1 regarding the imposition of late charges and the allocation of payments is not within the authority of the Board of Directors by virtue of the By-Law provision, Article IV, 2.
 "(o) Adopting and amending reasonable Rules and Regulations governing the conduct of all people on the Property and the operation and use of the Condominium."
The tardy payment of a common expense charge does not come within "governing the conduct of all people on the Property and the operation and use of the Condominium." The court concludes that plaintiff had no authority to adopt Rule #1 under Article IV, 2 of the By-Laws as the plaintiff contends.
The court therefore holds that the defendant is not liable for any late fees. [Plaintiff could adopt a rule such as Rule #1 by appropriate action of its Unit Owners.]
Defendant took title to Unit B-1 in July 1988, Plaintiff claims that defendant "became liable for payment of such common expense assessments from August of 1988 to the present." Plaintiff's Brief, 4/7/92, P. Plaintiff now, but not originally, CT Page 10184 acknowledges that the August 1988 fee was paid by the previous owner and that defendant is not liable for August 1990.
Defendant is liable for a period of 51 months [September 1988 through November 1992]. At $62.59 per month, this equals $3,192.09. As of April 7, 1992, defendant had paid $1376.99. $1376.09 divided by $62.59 is 22 months. The court will apply the amount paid to the first 22 months, September 1988 through June 1990. Defendant still owes [$3192.09 — $1376.99] $1,815.10 for the common expense charges for the months of July 1990 through November 1992.
The plaintiff's by-laws provide for interest at 12% per year. Exhibit A, Art. VII, 7, p. 17. Interest is due from July 1, 1990 to date (November 19, 1992) on the monthly payments for July 1990 through November 1992. This amounts to $260.18. [$1815.10 x 12% x 872/365 x 1/2]
Defendant purchased Unit A-6 in August 1988. She disposed of it in June 1990. Exhibit 1. Defendant "became liable for the payment of such common expense assessments from September of 1988 until June, 1990." Plaintiff's Brief, p. 2. Plaintiff claims the following is due for Unit A-6:
 "1. Late fees $220.00 2. Interest 74.00 3. Common charges $1,533.46 4. Payment received ($1,508.43) (includes July 1989 payment)
Total $319.03"
Plaintiff's Brief, p. 4.
September 1988 through June 1990 inclusive, is 22 months. Plaintiff claims defendant owes $1,533.46 for common charges. Plaintiff seeks to have plaintiff pay common charges for over 24 months [$1,533.46 divided by $62.59 = 24.1]. For the common charges alone, plaintiff has overpaid by some $131.45. As noted elsewhere, the court finds that plaintiff cannot recover for the late fees. The court cannot determine the extent to which the claimed interest is due to the late charge assessments. The court believes a substantial part, if not all, of the interest charges are a result of the late charges assessment and its domino effect. Defendant has not counterclaimed for any CT Page 10185 overpayment.
The court finds that plaintiff is not due anything for Unit A-6.
Defendant has counterclaimed that Plaintiff's actions towards her tenant caused the tenant not to pay her rent. The court finds that defendant failed to carry her burden of proof on the counterclaim.
In each case, plaintiff seeks to foreclose the liens created by statute. The liens in suit can be foreclosed just as a real estate mortgage.
 "Such lien may be foreclosed by suit by the association in like manner as a mortgage of real property, . . . ." C.G.S. 47-77(a).
 "The association's lien may be foreclosed in like manner as a mortgage on real property." C.G.S. 47-258(j).
The cause of the situation which brought about these suits was largely the fault of the plaintiff. The actions for foreclosure of these liens are equitable proceedings.
 "It is well established that a foreclosure action constitutes an equitable proceeding. City Savings Bank v. Lawler, 163 Conn. 149, 155, 302 A.2d 252 (1972); First New Haven National Bank v. Rowan, 2 Conn. App. 114, 118, 476 A.2d 1079 (1984). . . . In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done. Reynolds v. Ramos, 188 Conn. 316, 320, 449 A.2d 182
(1982). The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court. Kakalik v. Bernardo, 184 Conn. 386, 395, 439 A.2d 1016 (1981). [Internal quotation marks and emphasis omitted.] Harbour Landing Development Corp. v. Herman, 27 Conn. App. 98, (1992)
The file in CV 89-0367403 reveals that Unit A-6 is subject to a mortgage to the New England Savings Bank. Plaintiff had made a motion to have the New England Savings Bank made a defendant in this action. The court granted the motion. Motion CT Page 10186 To Cite In Party Defendant [116]. The motion indicates the mortgage was in the original amount of $43,200. The plaintiff's appraisal of Unit A-6 is $32,000. Plaintiff's Exhibit C. There is no indication in the file that the New England Savings Bank was actually made a party. The rules of practice provide:
"Sec. 186. Foreclosure Complaint; Pleading Encumbrances
 "The complaint in all actions seeking the foreclosure of a mortgage or other lien on real estate shall set forth, in addition to the other essentials of such complaint: All encumbrances of record upon the property both prior and subsequent to the encumbrances sought to be foreclosed, the dates of such encumbrances, the amount of each and the date when such encumbrance was recorded; . . . ." P.B. 186.
The lien established by C.G.S. 47-258 creates some priority over a mortgage.
 "Liens of an association of condominium owners enjoy a limited priority to the extent of common charges for the six months immediately preceding the foreclosure action." Caron, Connecticut Foreclosures — An Attorneys Manual of Practice and Procedure.2d Ed. Section 4.04L. See also, Hudson House Condominium Assn., Inc. v. Brooks, 223 Conn. 610 (August 12, 1992).
Plaintiff did not have the New England Savings Bank made a party. It would not be proper or equitable under all the the circumstances to grant foreclosure.
Plaintiff has claimed attorneys fees in both of these cases. Plaintiff would be entitled to such an award if it were the "prevailing Party." C.G.S. 47-77 and 47-258(g). The plaintiff sought foreclosure. The plaintiff sought late charges. The court holds that plaintiff is not entitled to the late charges or foreclosure. The plaintiff is not the "prevailing party" in either case.
In CV 89-0367404S, judgment shall enter for the defendant on the complaint and for the plaintiff on the counterclaim. Costs are not to be taxed. CT Page 10187
In CV 89-0367403, judgment shall enter in the amount of $1,815.10 principal, and $260.18 interest, for a total of $2,075.20. Costs may be taxed in favor of the plaintiff, but those incident to foreclosure shall not be included.
Parker, J.